# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

JIE XIAO,
     *Appellant*,

     v.

RONALD I. CHORCHES, TRUSTEE,
     *Appellee*.

Case No. 3:18-cv-1477-MPS

## RULING ON APPEAL FROM BANKRUPTCY COURT ORDER

Appellant and bankruptcy debtor Jie Xiao ("Xiao") appeals from an order by the United States Bankruptcy Court for the District of Connecticut (the "Bankruptcy Court") sustaining appellee and Bankruptcy Trustee Ronald I. Chorches' (the "Trustee") objection to Xiao's claim that the funds in the LXEng, LLC ("LXEng") Pension Plan (the "Plan") were exempt from his bankruptcy estate and thus protected from his creditors. For the reasons that follow, I affirm the Bankruptcy Court's ruling, which found that the Plan did not satisfy the requirements for exempt retirement funds set forth in the Bankruptcy Code, 11 U.S.C. § 522(d)(12).

## I. Background

The following facts are drawn from the Bankruptcy Court's findings of fact, the parties' briefs, and the joint stipulation of facts submitted in the Bankruptcy Court, and are undisputed unless otherwise noted. I set forth only those facts relevant to the present appeal.

### Formation of LXEng and the Plan

Xiao and Michael Little formed LXEng in 2007. (ECF No. 1-1 (Bankruptcy Court's Ruling ("Ruling")) at 5.) LXEng was an engineering consulting company that sold technology

packages and services to its clients. (*Id.*) Xiao and Little were each initially 50% owners of LXEng. (*Id.*) After Little died in a plane crash on November 3, 2007, Xiao's wife, Xin Chen, was made a 10% owner of LXEng, and Xiao assumed 90% ownership. (*Id.*) Xiao became the managing member of LXEng. (*Id.*)

The pension plan at issue in this case was formed on December 15, 2007 with an effective date retroactive to January 1, 2007. (Ruling at 5.) At the time of the Plan's adoption, Xiao owned 90% of LXEng and was its managing member; the remaining 10% was owned by Chen. (*Id.*) Xiao signed the Plan on behalf of LXeng, the Employer and Administrator of the Plan, and Xiao and Chen were listed as the Plan's co-trustees. (*Id.*) The Plan also listed Keystone Healthcare, LLC ("Keystone"), as a "Participating Employer" under the Plan. (*Id.*) Keystone was a consulting company Xiao had previously established to provide consulting services in the pharmaceutical industry and in which he had a 100% stake. (*Id.* at 5-6.) No business relationship existed between Keystone and LXEng other than the fact that Xiao owned both companies. (*Id.* at 6.)

As of December 31, 2007, both Xiao and Chen were listed as "highly compensated employees" of LXEng. (*Id.*) For the calendar year 2007, LXEng reported to the Internal Revenue Service ("IRS") ordinary business income of $1,341. (*Id.*) As of December 31, 2008, Xiao and Chen were still listed as the only two participants in the Plan, and were each 20% vested under the six-year vesting schedule. (*Id.*) For the calendar year 2008, LXEng reported ordinary business income of $462,747 to the IRS. (*Id.*) The IRS issued an opinion letter regarding the plan dated March 31, 2010, which the Bankruptcy Court found addressed only the form of the Plan. (*Id.*)

Several professionals were involved in the administration of the Plan. PenServ, Inc. ("PenServ") acted as the third-party administrator of the Plan. (*Id.* at 7.) Michael F. Ostuni ("Ostuni") was the president and sole owner of PenServ. (*Id.*) PenServ was not a fiduciary of the Plan and was unable to take any action regarding the Plan without direction from LXEng, Xiao as the owner of LXEng, or LXEng's advisors Llyod Cazes ("Cazes") and Michael Caputo ("Caputo"). (*Id.*) Cazes was the accountant for Xiao, LXEng, Keystone, and the vast majority of Xiao's other United States entities. (*Id.*) He filed LXEng's 2007, 2008, 2009, and 2010 tax returns with the IRS at Xiao's direction. (*Id.*) Caputo was retained by LXEng as a financial planner. (*Id.*)

### The First Discretionary Amendment

Initially, the Plan required one year of service and the attainment of age 21 for employees to be eligible to participate in the Plan. (*Id.*) The beginning date for any prospective participant in the Plan was the earlier of the first day of July or the first day of January coinciding with or following the date on which the participant has met the requirements to participate in the Plan. (*Id.* at 7-8.) Plan participants would have their benefits vest over a six-year graded period, with 20% vesting after two years and each additional year resulting in an additional 20%. (*Id.* at 8.) A year of service for vesting meant a twelve-month period beginning on an employee's date of employment or any anniversary of that date during which he or she completed at least 1,000 hours of service. (*Id.*)

The Plan was amended on March 1, 2009, effective retroactively to January 1, 2009 (the "2009 Amendment"). (*Id.*) The Bankruptcy Court found that PenServ prepared the 2009 Amendment at the direction of LXEng and that it was a discretionary amendment elected by LXEng. (*Id.*) Xiao signed the 2009 Amendment on behalf of LXEng, as the Employer and

Administrator of the Plan, and, with Ms. Chen, as co-trustee. (*Id.*) As of January 1, 2009, LXEng had eleven employees in addition to Xiao and Chen, but the Plan's only participants were Xiao and Chen. (*Id.*) The 2009 Amendment excluded from Plan participation non-owner employees who were highly compensated employees. (*Id.*) The 2009 Amendment also increased the years of service to become eligible for participation to two years and provided for 100% vesting immediately for all current Plan participants. (*Id.*) Xiao and Chen became fully vested in the Plan as a result of the 2009 Amendment, but the effect of the amendment was to extend the participation requirement for LXEng's remaining employees to two years. (*Id.* at 9.) The Bankruptcy Court found that PenServe would not have advised LXEng, or any other client, to adopt an amendment similar to the 2009 Amendment. (*Id.*)

### The Second Discretionary Amendment

On December 15, 2009, the Plan was amended effective January 1, 2010 ("2010 Amendment"). (*Id.*) The 2010 Amendment froze participation in the Plan for employees who were not already participants as of January 1, 2010, as well as benefits accrual. (*Id.*) The practical effect of the 2010 Amendment was to exclude all then-present LXEng employees and any future LXEng employees from participating in the Plan and to prevent their accrual of benefits under the Plan, with the exceptions of Mr. Xiao and Ms. Chen. (*Id.*) The 2010 Amendment was offered to LXEng as an option by PenServ based upon information PenServ received from LXEng, Xiao, Cazes, and Caputo that adverse business conditions had arisen and that the Plan had become too costly. (*Id.* at 10.) Xiao signed the 2010 Amendment on behalf of LXEng, as the Employer and Administrator of the Plan, and, with Ms. Chen, as co-trustee. (*Id.*) As of January 1, 2010, Xiao and Chen were still listed as the only two participants in the Plan.

(*Id.*) Several of LXEng's employees would have been participants in the Plan by 2010 or 2011 if not for the 2009 and 2010 Amendments. (*Id.*)

At the time of the 2010 Amendment, LXEng's business appears to have been growing. Its taxable income grew from $462,747 in 2008 to $989,384 in 2009 to $1,601,481 in 2010. (*Id.*) In 2010, LXEng recognized revenue in excess of $4 million and had received a payment of $6 million on one of its contracts. (*Id.*) At the same time, LXEng still had a $3 million receivable, and it had access to a $2.9 million legal reserve fund. (*Id.*)

### The Mandatory Amendments

On January 26, 2009 and December 4, 2009, PennServ prepared amendments to the Plan pursuant to regulatory requirements, which it advised LXEng were mandatory. (*Id.* at 11.) PenServ was not aware whether LXEng executed these amendments, because executed copies were never provided to PenServ by LXEng. (*Id.*) In 2010, PenServ prepared a further amendment, pursuant to the Economic Growth and Tax Relief Reconciliation Act ("EGTRRA"). (*Id.*) The Plan was amended and restated as of December 15, 2011 to comply with EGTRRA. (*Id.* at 11.) The EGTRRA restatement of the Plan did not have any effect on the applicability of the 2009 and 2010 discretionary amendments. (*Id.* at 12.)

### LXEng Fully Funds and then Terminates the Plan

In September 2010, after the 2010 Amendment, LXEng deposited $38,849 into the Plan to fully fund the Plan for the calendar year 2009, the last year before the Plan was frozen. (*Id.*) At the time, the minimum funding requirement was $23,058, which LXEng had already met. Thus, Xiao was not obligated to deposit the additional $38,849 into the Plan. (*Id.*). Xiao authorized the $38,849 payment in a conversation with Cazes. (*Id.*)

LXEng terminated the Plan effective January 15, 2011, by a resolution dated January 1, 2011.  (*Id.*)  Xiao signed the resolution as the "Principal" of LXEng and solely acknowledged receipt of the resolution on behalf of the Plan as co-trustee.  (*Id.*)  Xiao and Chen were the only participants in the Plan at the time it was terminated.  (*Id.*)  The plan was in operation for approximately four years prior to termination.  (*Id.*)

### Bankruptcy Filing and Claim of Exemption

On July 30, 2013, the Petition Date, Xiao filed for voluntary bankruptcy relief under Chapter 7 of the Bankruptcy Code.  (*Id.* at 13.)  As of the Petition Date, Xiao was the sole participant and the sole beneficiary of the Plan, as Xiao and Chen had obtained a divorce and Chen's interest in the Plan had been transferred to Xiao as part of the judgment of divorce.  (*Id.*)  As of December 31, 2013, the Plan had $471,951.00 in a brokerage account at Summit Equities, Inc.  (*Id.*)

On August 7, 2013, Xiao filed Schedules A-J to supplement his bankruptcy petition.  (*Id.*)  In Schedule C, he claimed an exemption for the entirety of the Plan's assets pursuant to 11 U.S.C. § 522(d)(10)(E).[1]  (*Id.*)  On November 20, 2014, the Trustee filed an objection to Xiao's claim of exemption.  (*Id.*)  On March 20, 2017, Xiao amended his claim of exemption in the Plan to one under 11 U.S.C. § 522(d)(12).[2]  (*Id.*)  On March 29, 2017, the Trustee filed an

---

[1] 11 U.S.C. § 522(d)(10)(E) exempts "[t]he debtor's right to receive . . . a payment under a stock bonus, pension, profitsharing, annuity or similar plan or contract . . . to the extent reasonably necessary for the support of the debtor and any dependent of the debtor, unless—(i) such plan or contract was established by or under the auspices of an insider that employed the debtor at the time the debtor's rights under such plan or contract arose; (ii) such payment is on account of age or length of service; and (iii) such plan or contract does not qualify under section 401(a), 403(a), 403(b), or 408 of the Internal Revenue Code of 1986."

[2] 11 U.S.C. § 522(d)(12) exempts "[r]etirement funds to the extent that those funds are in a fund or account that is exempt from taxation under section 401, 403, 408, 408A, 414, 457, or 501(a) of the Internal Revenue Code of 1986."  In addition, 11 U.S.C. § 522(b)(4), which the Code makes applicable to exemptions under Section 522(d)(12), provides:

> (A) If the retirement funds are in a retirement fund that has received a favorable determination under section 7805 of the Internal Revenue Code of 1986, and that determination is in effect as of the date of the filing of the petition in a case under this title, those funds shall be presumed to be exempt from the estate.

objection to Xiao's amended claim of exemption.  (*Id.*)  After a two-day trial held on September 12 and 13, 2017, the Bankruptcy Court sustained the Trustee's objection to Xiao's claim of exemption.  Xiao filed a timely appeal.

## II.  Legal Standard

 "A district court reviews the bankruptcy court's conclusions of law de novo and its findings of fact under a 'clearly erroneous' standard."  *CadleRock J.V. II, L .P. v. Beaudoin (In re Beaudoin)*, 388 B.R. 6, 8-9 (D. Conn. 2008) (internal quotation marks and citation omitted). Fed. R. Bankr. P. 8013 provides that "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."  A finding of fact is clearly erroneous within the meaning of Rule 8013 when "although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been made."  *Sherman v. Novak (In re Reilly)*, 245 B.R. 768, 772 (B.A.P. 2d Cir.), *aff'd without opinion*, 242 F.3d 367 (2d Cir. 2000).  When mixed questions of law and fact are raised on appeal, they are presumptively subject to de novo review.  *Id.*

---

(B) If the retirement funds are in a retirement fund that has not received a favorable determination under such section 7805, those funds are exempt from the estate if the debtor demonstrates that—
(i) no prior determination to the contrary has been made by a court or the Internal Revenue Service; and
(ii)(I) the retirement fund is in substantial compliance with the applicable requirements of the Internal Revenue Code of 1986; or
(II) the retirement fund fails to be in substantial compliance with the applicable requirements of the Internal Revenue Code of 1986 and the debtor is not materially responsible for that failure.
11 U.S.C. § 522(b)(4).

### III. Discussion

### A.  The Exemption Trial and the Adversary Proceedings Were Not Improperly Consolidated

Xiao first argues that the Bankruptcy Court "substantively consolidate[d]" the exemption trial and three related adversary proceedings also before the Bankruptcy Court.[3]  (ECF No. 16 at 11.)  In support, Xiao points to testimony by the Trustee referencing related fraudulent conveyance proceedings.  (*Id.*; ECF No. 11 ("Trial Tr. 1") at 12.)  Xiao also points to the admission into evidence of Xiao's testimony from the previous adversary proceedings as well as his Rule 2004 deposition testimony.  (ECF No. 16 at 9; ECF No. 28 at 2.)  Xiao's argument that the proceedings were somehow "substantively consolidate[d]" and that the Bankruptcy Court improperly "allow[ed] the Trustee to have a fraud trial" borders on the frivolous.  The Trustee referred to the related fraudulent proceedings only in passing, when describing his role as Chapter 7 Trustee.  (Trial Tr. 1 at 12.)  The trial and deposition transcripts Xiao appears to refer to were never admitted as full exhibits (Trial Tr. 1 at 210-11), even though they would have been admissible as statements by a party as long as they were relevant, Fed. R. Evid. 801(d)(2); Fed. R. Bankr. Proc. 9017 ("The Federal Rules of Evidence . . . apply in cases under the Code.").  It appears they were used on only two occasions for the purpose of impeachment (ECF No. 12 ("Trial Tr. 2") at 8-10, 44-48.)  Xiao points to no evidence—and the Court is aware of none—that either the passing remark by the Trustee or the use of the transcripts prejudiced him.  Xiao cites no relevant legal authority to support his novel theory.  He points to no evidence that the Bankruptcy Court applied an incorrect legal standard.  Xiao's conclusory allegation regarding

---

[3] Prior to the trial on the Objection, the Bankruptcy Court conducted adversary proceedings in three related matters: *Dow Corning Corp. et al v. Jie Xiao* (Adv. Pro No. 14-05084) (a complaint brought under 11 U.S.C. § 727 to deny Xiao a discharge); *Ronald I. Chorches, Trustee v. Xin Chen* (Adv. Pro. No. 14-05019) (a fraudulent transfer claim seeking to invalidate over a million dollars' worth of transfers from Xiao to his wife within weeks of the Petition Date); and *Richard Coan, Trustee for LXEng, LLC v. Xin Chen* (Adv. Pro. No. 15-05027) (fraudulent transfer claims relating to transfers from LXEng to Xiao's former spouse).

the "impossibility of separating the subject matters and burdens of proof" between the exemption

trial and the other proceedings (ECF No. 28 at 2) is without support. His argument plainly fails.

## B. The Plan Was Not Presumptively Exempt

Xiao next argues that the Bankruptcy Court erred in declining to apply a presumption in

favor of the Plan in light of two favorable IRS opinion letters. (ECF No. 16 at 16-19; ECF No.

25-3 at 3; ECF No. 25-4 at 2.) 11 U.S.C. § 522(b)(4)(A) provides that "[i]f the retirement funds

are in a retirement fund that has received a favorable determination under section 7805 of the

Internal Revenue Code of 1986, and that determination is in effect as of the date of the filing of

the petition in a case under this title, those funds shall be presumed to be exempt from the

estate."[4]

Xiao argues that the IRS letters establish a presumption of exemption, citing *In re*

*Pomeroy*, where the Court held that a similar letter[5] qualified as a favorable determination under

Section 522(b)(4)(A), thus establishing a rebuttable presumption. *In re Pomeroy*, 2016 WL

3564378, at *11 (Bankr. E.D. Cal. June 21, 2016). Here, the Bankruptcy Court came to the

opposite conclusion, relying on a series of cases finding no presumption in similar

circumstances. *See RES-GA Dawson, LLC v. Rogers (In re Rogers)*, 538 B.R. 158, 173 (Bankr.

N.D. Ga. 2015) ("[A] favorable opinion letter as to the form of a prototype plan by itself is not a

sufficient 'favorable determination' for purposes of § 522(b)(4)(A)."); *In re Bauman*, 2014 WL

816407, at *14 (Bankr. N.D. Ill. 2014) ("A letter of this kind, addressing only 'form' and not

'operation' does not raise the presumption under section 522(b)(4)(A).") (citing *Agin v. Daniels*

---

[4] The provisions of 11 U.S.C. § 522(b)(4) are applicable to claims of exemption under § 522(d)(12). *See* 11 U.S.C. § 522(b)(4) ("For purposes of paragraph (3)(C) and (d)(12), the following shall apply . . . .").

[5] The *In re Pomeroy* letter began with the same language as the letters at issue here. *Compare In re* Pomeroy, 2016 WL 3564378, at *10 ("In our opinion, the form of the plan identified above is acceptable under section 401 of the Internal Revenue Code for use by employers for the benefit of their employees.") *with* ECF No. 25-3 at 3; ECF No. 25-4 at 2.

(*In re Daniels*), 452 B.R. 335, 347 (Bankr. D. Mass. 2011), *aff'd on other grounds*, 482 B.R. 1 (D. Mass. 2012), *aff'd sub nom Daniels v. Agin*, 736 F.3d 70 (1st Cir. 2013)).

I need not weigh in on this disagreement, because the Bankruptcy Court also found that, in any event, the Plan was "no longer protected by [the] determination letters" (Ruling at 16), and that finding was not clearly erroneous. In coming to this conclusion, the Bankruptcy Court credited the testimony of Xiao's own expert, Andrew J. Fair, that an IRS letter of the type at issue here no longer applies once a plan has been amended. (Trial Tr. 2 at 131 ("[B]y amending it you've changed the form. The determination letter only applies to the—what you've got there. The IRS basically takes the position if you change anything in these adoption agreements or volume documents, if you make a change then it's no longer protected by the letter.").) It is undisputed that the Plan was amended multiple times after the plan description approved by the IRS was submitted on January 31, 2008, including the discretionary amendments effective January 1, 2009 and January 1, 2010 (Ruling at 8, 9 (citing the parties' joint stipulation of facts)).[6] These amendments made substantive changes to the Plan's eligibility requirements. (Ruling at 7-9.) Consequently, even if the two IRS letters were "favorable determinations" for the purposes of the statute, they were not "in effect as of the date of the filing of the petition," 11 U.S.C. § 522(b)(4)(A), and thus the Bankruptcy Court did not err in holding that they did not create a presumption under the statute.[7]

---

[6] Although the more recent IRS letter is itself dated March 31, 2010, it makes clear that it relates to a "Volume Submitter Defined Benefit Plan," i.e., a "form of the plan," that was submitted on January 31, 2008. (ECF No. 25-4 at 2.)

[7] Xiao also argues that the Bankruptcy Court erroneously relied on the Trustee's expert's opinion that the EGTRRA Plan Amendments had not been adopted. (*Id.* at 13.) But the Bankruptcy Court makes no mention of any such opinion in its discussion of the presumption. (Ruling at 15.) Moreover, the Bankruptcy Court found that the Plan *was* amended and restated in response to EGTRRA on December 15, 2011 (Ruling at 11-12). Xiao's contention is thus without merit.

## C. The Plan Was Not in Substantial Compliance with IRS Requirements

Under 11 U.S.C. § 522(b)(4)(B), "if the retirement funds are in a retirement fund that has not received a favorable determination . . . , those funds are exempt from the estate if the debtor demonstrates that—(i) no prior determination to the contrary has been made by a court or the Internal Revenue Service; and (ii)(I) the retirement fund is in substantial compliance with the applicable requirements of the Internal Revenue Code of 1986; or (II) . . . the debtor is not materially responsible for [the failure to achieve substantial compliance]." The Bankruptcy Court found that although there was no prior determination by the IRS or a court that the Plan was not in compliance, the evidence presented at trial "overwhelmingly supports that the Plan was not in substantial compliance" with the Internal Revenue Code ("IRC"), and that Xiao had failed to meet his burden to show that he was not materially responsible for the noncompliance. (Ruling at 16, 22.)

Xiao challenges the finding that the Plan was not in substantial compliance in several respects. He appears to argue that a plan is in substantial compliance unless the debtor uses it as his "own personal bank account" or engages in similar conduct. (ECF No. 16 at 18.) Xiao cites cases that appear to have involved such conduct. *See, e.g.*, *In re Daniels*, 452 B.R. 335, 349-51 (Bankr. D. Mass. 2011). But he points to nothing in these cases that purports to limit failures of "substantial compliance" to these types of violations.[8]

---

[8] Xiao also makes a series of irrelevant arguments under the heading "[t]he Bankruptcy Court erred in automatically disqualifying debtor's plan." (ECF No. 16 at 15.) He appears to argue, for example, that the fact that the "funds here were never determined unqualified [by the IRS] and were never distributed," *id.*, means that the Bankruptcy Court must have erred. But he does not explain the relevance of this observation, and the cases he cites deal with issues unrelated to the Bankruptcy Court's ruling. *See Clark v. Rameker*, 134 S.Ct. 2242 (2014) (holding that inherited funds from parent's IRA were not "retirement funds" under 11 U.S.C. § 522, in part because they were distributed); *In re Plunk* 481 F.3d 302, 307 (5th Cir. 2007) (holding that "when disqualifying events occur after the IRS has last determined that a plan is qualified, a court may, [under a Texas statute], determine that plan is no longer qualified based on those events."). Similarly, his argument that, "[h]ere, Plan formalities were never disregarded," misses the point. The Plan was found to be out of compliance with the IRC because it violated specific rules regarding permanency, minimum participation, and non-discrimination, not because its formalities were disregarded or its funds were distributed.

As the Bankruptcy Court explained, "the Plan failures at issue in this case do not merely constitute technical defaults, but instead are operational failures that are substantial violations of the core qualifications for a retirement plan . . . ." (Ruling at 24 (internal quotation marks omitted).) The thrust of the violations identified by the Bankruptcy Court is that the Plan was formed and operated "in order to solely benefit Mr. Xiao and his then spouse, Ms. Chen." (*Id.*) In essence, the Bankruptcy Court found that the Plan discriminated in favor of LXEng's owners and against LXEng's other employees. This conduct offends what one treatise describes as the "orthodox rationale" of providing approximately $100 billion in tax subsidies to qualified plans—"to help as many Americans as possible create income security for that period of life when they are no longer supporting themselves." 1 Federal Income Taxation of Retirement Plans § 4.07 (2019). The IRC's strategy to achieve this goal is

> first, to make the tax benefits of employer-sponsored plans sufficiently attractive to the tax-sensitive people who own and manage businesses so that they will decide to set up plans to capture tax benefits for themselves, and, second, to require such plans, once established, to provide meaningful benefits not only to the people who set them up, but also to lower- and moderate-income workers. The IRC effects the latter part of the strategy through a series of qualification requirements, generally referred to as the nondiscrimination rules, which require plans to cover a percentage of a firm's non-highly compensated employees and to provide them with benefits comparable, as a percentage of pay, to the benefits earned by the highly compensated.

*Id.* Thus, violations of the provisions at issue here are far from de minimis or merely technical; rather, they concern core elements of the regulatory regime governing qualified retirement plans. Xiao's arguments that the compliance failures found by the Bankruptcy Court are not "substantial" are unavailing.

Xiao challenges the Bankruptcy Court's factual finding that there was no business necessity for freezing the Plan and then terminating it fewer than four years after it was created. (ECF No. 16 at 24-25.) IRS Regulations provide that the "abandonment of the plan for any

reason other than business necessity within a few years after it has taken effect will be evidence that the plan from its inception was not a bona fide program for the exclusive benefit of employees in general.  Especially will this be true if, for example, a pension plan is abandoned soon after pensions have been fully funded for persons in favor of whom discrimination is prohibited under section 401(a)."  26 C.F.R. § 1.401-1(b)(2).  In concluding that the Plan violated the permanency requirement, the Bankruptcy Court found that "at the time the Plan was terminated, it was not facing adverse business conditions," and thus there was no business necessity to terminate the Plan.  (Ruling at 17.)  In support of its conclusion, the Bankruptcy Court detailed LXEng's financial condition as of 2010, shortly before the Plan was terminated.[9] It found that LXEng's taxable income grew substantially from 2008 to 2010 and that, as of 2010, it had a $2.9 million legal reserve fund and a $3 million receivable.  (*Id.* at 10.)  It declined to credit the testimony of Xiao's expert that the Plan was terminated because of adverse business conditions because the expert relied exclusively on the depositions of Xiao and Ostuni, had not reviewed LXEng's tax returns, and appeared to be unaware of LXEng's financial condition at the time of the termination.  (*Id.* at 17; Trial Tr. 2 at 138-40.)  The Bankruptcy Court also determined that Xiao's own testimony lacked credibility, calling it "conclusory, evasive, and seemingly rehearsed" (*id.* at 3, 17.)—a determination to which this Court owes considerable deference. *See In re Bonnanzio*, 91 F.3d 296, 302 (2d Cir. 1996) ("[W]here intent is at issue, the debtor's credibility is a substantial factor, and the bankruptcy court's assessment is entitled to great deference." (citing *In re Shaheen*, 11 B.R. 48, 53 (S.D.N.Y. 1990))).

Xiao argues, without citation, that the Bankruptcy Court erred in ignoring the testimony that "adverse conditions" existed.  (ECF No. 16 at 24.)  Xiao seems to be referring to his own

---

[9] It is undisputed that the Plan was terminated on January 1, 2011, effective January 15, 2011.  (Ruling at 12 (citing the parties' joint stipulation of facts).)

testimony and the testimony of his expert, Mr. Fair. But the Bankruptcy Court did not ignore this testimony; as discussed above, it found it not to be credible. Xiao also argues, without citation, that LXEng's tax returns demonstrate a steady decline in income from 2007 to 2009. This contradicts Xiao's own testimony that the company's income was increasing at the time, as well as the tax returns themselves, which show steadily increasing taxable income. (Trial Tr. 2 at 43; ECF No. 25-8 at 2; ECF No. 25-9 at 2; ECF No. 25-10 at 2.) Xiao also argues that the fact that LXEng entered bankruptcy two years later is evidence that adverse conditions existed in 2010. While it is true that LXEng's eventual bankruptcy is some evidence of the existence of business necessity in 2010, given the substantial evidence cited by the Bankruptcy Court, it is not nearly enough to leave this Court with "the definite and firm conviction that a mistake has been made." In short, I find that the Bankruptcy Court's finding that there was no business necessity for terminating the Plan was not clearly erroneous.[10]

Xiao makes several additional, unsupported arguments. He argues, for example, that the Bankruptcy Court erred in failing to credit Ostuni's testimony "that the Plan was qualified on the Petition Date." (ECF No. 16 at 17.) But Ostuni does not appear to have given any such testimony. Xiao provides no citation to the trial transcript, and the Court can identify no testimony by Ostuni providing an opinion as to whether the Plan was qualified on the Petition Date. Ostuni testified that he did not believe a plan would be disqualified simply because a mandatory amendment had not been executed. (Trial Tr. 1 at 68-69.) But the Bankruptcy Court did not rely on the alleged non-execution of the mandatory amendments in concluding that the

---

[10] Xiao does not appear otherwise to challenge the substance of the Bankruptcy Court's findings with respect to the specific violations that convinced the Bankruptcy Court that the Plan was not in substantial compliance with the IRC—namely, that the Plan violated the permanency requirement, the minimum participation requirements, the nondiscrimination and exclusive benefit requirements, and the requirement that a plan be operated according to its terms.

Plan was not substantially compliant. Thus, there is no contradiction between this testimony and the Bankruptcy Court's findings.

Xiao also argues, again without citation, that Ostuni testified that no disqualification notice or determination was ever received with regard to the Plan. But any such testimony is also not incompatible with the Bankruptcy Court's ruling. The Bankruptcy Court found that the debtor *had* successfully demonstrated that "no prior determination to the contrary has been made by a court or the Internal Revenue Service," 11 U.S.C. § 522(b)(4)(B)(i). (*See* Ruling at 16 ("Here, there was no prior determination to the contrary made by a court or the IRS.").) The Bankruptcy Court's ruling denying the exemption was instead based on the requirements of 11 U.S.C. § 522(b)(4)(B)(ii), which address substantial compliance.

Xiao also argues, without citation, that the Trustee erroneously argued that LXEng's "alleged failure to file the EGTRRA Restatement when the Plan was frozen and then terminated is what disqualified the Plan." (ECF No. 16 at 17.) But the Bankruptcy Court did not rely on any alleged failure to file an "EGTRRA Restatement." The Bankruptcy Court identified four areas of noncompliance in support of its ruling—violations of the permanency requirement, the minimum participation requirements, the nondiscrimination and exclusive benefit requirements, and the requirement that a plan be operated according to its terms—none of which relate to the EGTRRA restatement. In short, the Bankruptcy Court did not err in finding that the Plan was not in substantial compliance with the IRC.

## D.  The IRS Corrective Programs

Xiao argues that the Bankruptcy Court erred in sustaining the Trustee's objection despite the availability of IRS corrective programs. (ECF No. 16 at 21-24; ECF No. 28 at 5.) It is

undisputed that such IRS programs exist, including the Voluntary Correction Program ("VCP") and the Self-Correction Program. (Ruling at 24; Trial Tr. 2 at 159-60.)

But it is "hornbook bankruptcy law that a debtor's exemptions are determined as of the time of the filing of his petition." *In re Cunningham*, 354 B.R. 547, 553 (D. Mass. 2006); *see also In re Richey*, 2011 WL 4485900, at *10 (B.A.P. 9th Cir. Aug. 8, 2011) ("[The] proper date for determining whether [an] exemption exists is the petition date." (citing *Owen v. Owen*, 500 U.S. 305, 314 n.6 (1991))). "This means the Court must 'focus only on the law and *facts* as they exist *on the date of filing the petition*." *In re Cunningham*, 354 B.R. at 553 (quoting *In re Peterson*, 897 F.2d 935, 937 (8th Cir. 1990)). As discussed above, the Bankruptcy Court properly found that the Plan was not in substantial compliance with the relevant regulations as of the Petition Date. Xiao's argument that this finding was erroneous due to the mere availability of corrective programs with potentially retroactive effect is unpersuasive.

Xiao relies on two cases where the Court retroactively credited post-petition participation in IRS corrective programs. In *Richey*, the Bankruptcy Appellate Panel affirmed the Bankruptcy Court's order directing the debtor to participate in the VCP and its subsequent retroactive crediting of the resulting IRS compliance letter. *In re Richey*, 2011 WL 4485900 at *11. Noting that there was neither controlling nor even persuasive authority on the matter, the Panel nonetheless concluded that the Bankruptcy Court did not run afoul of the rule that the existence of exemptions is determined on the date of the petition, because "on the date of the petition, [the] Richeys possessed a right under federal tax law to participate in the VCP and seek a determination from the IRS on whether or not the Plans were qualified on their termination dates, and to cure any defects potentially disqualifying the Plans to bring them back into IRC compliance with a retroactive effect." *Id.* Similarly, in *Galbraith*, the Bankruptcy Court, relying

on *Richie*, credited the debtors' post-petition participation in the VCP and recognized the retroactive effect of the associated corrective action. *In re Gilbraith* 523 B.R. 198, 208, 210 (Bankr. D. Ariz. 2014).

But the circumstances in *Gilbraith* and *Richey* differ from the present case in several critical respects. First, in both cases, the compliance failures were less serious than the ones at issue here. In *Gilbraith*, for example, the debtors had failed to timely execute required amendments. *Id.* at 203, 206. The Bankruptcy Court described this compliance failure as an "apparently minor Plan Document Failure." *Id.* at 207. In fact, the *Gilbraith* Court went so far as to say that "[e]ven if the Plan had not received a favorable determination," the debtors would have been entitled to the exemption anyway, because the "Plan was in substantial compliance with the IRC." *Id.* at 209. Here, on the other hand, the Bankruptcy Court properly found that the Plan was *not* in substantial compliance with the IRC, as there were "substantial violations of the core qualifications for a retirement plan."[11] (Ruling at 24 (internal quotation marks omitted).)

Second, in both *Richey* and *Galbraith*, the debtors had *already* participated in the corrective program and had received a favorable determination from the IRS; in *Galbraith*, the debtors had applied to participate in the program only seven weeks after the petition was filed. *In re Galbraith*, 523 B.R. at 200. The question before the Court was whether such a determination should be applied retroactively for the purposes of the Bankruptcy Code. By contrast, Xiao has never sought to participate in any corrective program and seems to argue that the mere possibility of future participation in such a program precludes any finding that the Plan was not in substantial compliance with the IRC. To accept Xiao's argument would represent a

---

[11] Although there was in fact some indication that Xiao, like the debtors in Gilbraith, may have also failed to timely execute mandatory amendments (see Ruling at 11), the Bankruptcy Court's ruling makes no finding as to whether such violations ultimately took place, and the Court's conclusion that the Plan was not in substantial compliance does not rely on any such violations.

significant, open-ended extension of *Richey* and *Galbraith*, neither of which is binding on me. Given that *Richey* and *Galbraith* are already arguably in tension with the basic rule that exemptions are determined as of the petition date, I decline the invitation to, not only adopt, but dramatically extend their holdings.  Doing so here would mean that, regardless of the extent of a Plan's non-compliance and the debtor's fault, the Plan would always be exempt from creditors as long as the debtor expressed an intent—even five years into a bankruptcy and after an adverse finding by the Court—to participate in an IRS compliance program in the hope of obtaining the agency's blessing.  *See Voluntary Compliance Program (VCP) – General Description*, IRS, http://www.irs.gov/retirement-plans/voluntary-correction-program-general-description (last visited Sept. 30, 2019) ("6. If we can't agree on a reasonable and appropriate correction, then we don't issue a compliance statement . . . .").  The test for exemption set forth in the Code would become practically superfluous.

The parties disagree as to whether there is a realistic prospect of successful corrective action; the Bankruptcy Court appears to have concluded that such efforts would likely be futile. (Ruling at 24.)  The parties also dispute the significance of Xiao's failure to take any steps toward corrective action thus far.  Xiao appears to claim that he should not be faulted for failing to take corrective action in the five years since his bankruptcy petition because he only "followed the Trustee's directive not to do anything with the Plan."  (ECF No. 16 at 22.)  I need not resolve these disputes, as I find that the mere possibility of future corrective action simply does not preclude an otherwise proper finding that a plan was not substantially compliant with the IRC under 11 U.S.C. § 522(b)(4)(B)(ii)(I) as of the petition date.

**E. Xiao Was Materially Responsible for the Substantial Compliance Failure**

Even if a Plan is not in "substantial compliance" with the IRC, the Plan may still be exempt if "the debtor is not materially responsible for that failure." 11 U.S.C. § 522(b)(4)(B)(ii)(II). The burden of proof is on the debtor to show he was not materially responsible. *See* 11 U.S.C. § 522(b)(4)(B)(ii) (providing that funds are only exempt if "the debtor demonstrates that" either the Plan was in substantial compliance or the debtor is not materially responsible for the compliance failure). The Bankruptcy Court concluded that Xiao failed to meet this burden. (Ruling at 22.) I agree.

It is undisputed that Xiao was the CEO of LXEng, that he "ran the company," and that he made the "business decisions" throughout the relevant time period. (Trial Tr. 2 at 14-15.) LXEng was, in turn, the Plan Administrator. It is also undisputed that Xiao was the co-trustee of the Plan, along with Ms. Chen, and signed each of the three one-page documents that form much of the basis of the violations found by the Bankruptcy Court—the 2009 and 2010 discretionary amendments and the 2011 termination (ECF No. 25-5 at 2; ECF No. 25-6 at 2; ECF No. 25-7 at 2). Ostuni's testimony that it was Xiao and LXEng, and not PenServ, that had final decision-making authority on whether to adopt an amendment (Trial Tr. 1 at 56) was unrebutted. Ostuni also testified that PenServ would not have advised a client to adopt an amendment like the 2009 Amendment (*id.* at 50), which effectively prevented any employees other than Xiao and his wife from qualifying for the Plan (*id.* at 117).

The fact that it is undisputed that Xiao had virtually plenary authority over the Plan as the owner and CEO of LXEng and as co-trustee of the Plan, coupled with the fact that the Bankruptcy Court properly found that the Plan was unlawfully constructed and manipulated to benefit Xiao and his then wife to the exclusion of LXEng's other employees, raises a strong

inference that Xiao was not only "materially" responsible, but primarily responsible, for the compliance failures that so benefited his interests. Given that it was Xiao's burden to show he was not materially responsible for the compliance failures, he faced an uphill climb in defeating this inference. He has failed to carry his burden.

Xiao testified that he delegated managing the Plan to his financial advisor, Caputo, his accountant, Cazes, and PenServ. (Trial Tr. 2 at 19.) He testified that he knew very little about the workings of the Plan (*id.* at 19), and simply followed the recommendations and instructions of his team (*id.* at 20). (*See also* ECF No. 16 at 20 ("PenServ together with [LXEng's] financial advisor and the CPA made the material decisions relative to the Plan. Debtor was consulted . . . maybe about four times a year with regard to the Plan.").) But the Bankruptcy Court generally found Xiao's testimony "evasive and seemingly rehearsed" and his credibility "strained" (Ruling at 3)—a finding to which this Court owes deference. In light of this, Xiao's testimony is plainly insufficient to outweigh the strong inference that Xiao understood at least the gist of the one-page amendment and termination documents that he signed, which so significantly changed the structure of the Plan of which he and his then wife were the sole beneficiaries. Xiao did not have to be an expert in the tax regulations governing pension plans to be "materially responsible" for the compliance failures. It is "axiomatic that ignorance of the law does not excuse noncompliance." *Women's Pavillion, Inc. v. Town of Babylon*, 502 F. Supp. 420, 423 (E.D.N.Y. 1980).

In short, where, as here, the debtor had sole control of the plan sponsor and administrator and final authority over decisions related to the plan, and where, as here, the compliance failures so clearly worked to the debtor's benefit, to the exclusion of other employees, the debtor faces a heavy burden in showing he was not materially responsible for the compliance failures. Xiao has

plainly failed to meet this burden. Conclusory claims that the debtor's agents, and not the debtor himself, were responsible for the compliance failures simply will not do.

## IV. Conclusion

For the reasons set forth above, the ruling of the Bankruptcy Court is AFFIRMED. The Clerk is directed to close the case.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:  Hartford, Connecticut
    September 30, 2019